**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARIUS MARTIS, derivatively on behalf of MULLEN AUTOMOTIVE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DAVID MICHERY, MARY WINTER, MARK BETOR, KENT PUCKETT, OLEG FIRER, JON NAJARIAN, JOHN ROLAND, TODD RAARUP, ARGUS MERCHANT SERVICES, LLC and RBL CAPITAL GROUP LLC, <br><br> Defendants, <br><br> and <br><br> MULLEN AUTOMOTIVE, INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br><br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Marius Martis ("Plaintiff" or "Martis"), derivatively, on behalf of Mullen Automotive, Inc. ("Mullen" or the "Company"), alleges the following based upon information and belief as to the investigation conducted by Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Mullen, securities analyst reports, press releases, and other public statements issued by, or about, the Company and the files in actions against nominal defendant as identified herein. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.

## INTRODUCTION

1.     This is a shareholder derivative action brought under Section 14 of the Securities Exchange Act of 1934 on behalf of Mullen seeking to reverse two ballot proposals approved by a tainted shareholder vote in August 2021 as part of the disastrous merger between privately held Mullen Technologies, Inc. ("MTC" or "Old Mullen") and Net Element Inc. ("Net") a public company in the payment processing business. The two proposals were: "Proposal No. 8" to approve the merger of MTI and Net; and Proposal No. 7 to approve the divestiture of all of Net's operations, assets and liabilities in exchange for a (measly) $10 million in forgiven loans (the "Divesture"). Votes were solicited from Plaintiff and Net shareholders via a materially false and misleading Proxy prepared by Net's directors and MTI's directors.

2.     As a result of the tainted shareholder vote, Net's extremely valuable payment processing operations were divested for inadequate consideration (in the Divestiture), and Net was then merged into an essentially worthless and non-existent electric vehicle business, Old Mullen. In the Divestiture, Defendants RBL Capital Group, LLC and Argus Merchant Services LLC received all of Net's valuable assets as a result of the tainted shareholder vote approving the Divestiture which are now subject to rescission under Section 29 of the '34 Act.

# II.

## JURISDICTION AND VENUE

3.     The claims asserted herein arise under the securities laws of the United States and the corporate laws of the State of Delaware.  This Court has jurisdiction over the subject matter of this action under its federal question jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange 15 U.S.C. § 78(aa) and Sections 14(a) and 20 of the Exchange

Act, 15 U.S.C. § 78(n)(a).  This Court also has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367(a).

4.      Jurisdiction is proper under Federal Rule of Civil Procedure 23.1 because Plaintiff was and currently is a shareholder of the Company and has been since the time of the transactions described herein and the action is not one in which collusion is alleged for jurisdictional purposes.  As alleged herein, demand would have been futile.

5.      Venue is proper in this District under 28 U.S.C. § 1391(a) because the Section 29 Defendants maintain principal executive offices in this District and/or the adjoining district and many of the acts charged herein, occurred in substantial part in this District.

6.      Defendants directly or indirectly used the mails and means and instrumentalities of interstate commerce in connection with the acts, practices and courses of businesses alleged herein.

## III.

## PARTIES

### A.      Plaintiff

7.      As set forth in the verification accompanying this complaint, Plaintiff Marius Martis is and has been a beneficial owner of Net continuously since at least 2016, and through the present.  Plaintiff will fairly and adequately represent the interests of the shareholders who are similarly situated in enforcing the right of the corporation.  The action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

### B.      Nominal Corporate Defendant

8.      Defendant Mullen Automotive Inc. ("Mullen") is the end product of the Merger and Divestiture and is an electric vehicle company, which almost three years after the Merger has

not manufactured or sold any vehicles. It is incorporated in Delaware and maintains its principal executive offices at 1405 Pioneer Street, Brea, California 92821. Mullen's shares are listed and trade on the NASDAQ exchange under the ticker symbol MULN. It suffered loss and damages when its shareholders were misled into voting for the Merger and Divestiture.

### C.    Individual Defendants

#### 1.    The Mullen Directors At The Time The Proxy Was Issued

9.    Defendant David Michery ("Michery") is Mullen's CEO, founder, President, Chairman, largest shareholder, and public face. Until at least the time of the November 5, 2021 reverse merger, Defendant Michery served in similar roles for Defendant MTI. He was its largest shareholder and controlled MTI and now Mullen through his ownership of stock and position as officer and director.

10.    Michery is now and was the "controlling shareholder" of Mullen at the time the Proxy was issued by virtue of Mullen's admission in SEC filings based upon equity ownership of Mullen. In connection with the Merger, Proxy and solicitation of votes, pre-merger Mullen issued materially false and misleading press releases on August 10, 2020, September 2020, December 30, 2020, March 18, 2021, August 3, 2021 and September 21, 2021.

11.    Defendant Mary Winter ("Winter") has served as a director of the Company since the closing of the merger with Net on November 5, 2021, and has been a director of MTI since 2018. She currently serves as the Secretary of the Company. Formerly, she was the Vice President of Operations of MTI since 2014.

12.    Defendant Kent Puckett ("Puckett") has served on the MTI Board from 2018 to 2021. He has been a director of Mullen since the closing of the Merger. He was also MTI's Chief Financial Officer of MTI from 2012 to 2018. Currently Defendant Puckett is the Chair of the

Compensation Committee and a member of the Mullen Audit and Nominating and Governance Committees.

13. Defendant Mark Betor ("Betor") has served on the MTI Board from 2018 to 2021. He has been a director of Mullen since the closing of the merger. Currently Defendant Betor is also a member of the Audit and Compensation committees, and Chair of the Nominating and Governance Committee.

14. The MTI Directors named herein were responsible for the contents of the Proxy.

### 2. The Net Defendants At The Time The Proxy Was Issued

15. Defendants Jon Najarian, Oleg Firer, John Roland, Todd Raarup were Net Directors who authorized, drafted and issued to Net shareholders, including Plaintiff, the materially misleading Proxy which is the subject of this suit soliciting shareholder votes in favor of, *inter alia*, "Proposal 1" to approve the merger and "Proposal 8" to approve a sale of all Net assets and liabilities to a related party (the "Divestiture").

### 3. The Defendant Beneficiaries Of The Divestiture

16. Defendant RBL Capital Group LLC ("RBL") was a lender to Net at the time of the Merger and is a New York limited liability company located at 525 Washington Boulevard, 15th Floor, Jersey City, New Jersey. Pursuant to the Divestiture Agreement, whose  shareholder approval was solicited through the defective Proxy, it became the owner of 100% of Net ownership interest in TOT Group Inc. a wholly owned subsidiary of Net wherein Net's business operations resided. The Divestiture was procured through a shareholder vote which violated Section 14(a) of the Securities Exchange Act of 1934 and it is therefore void under Section 29(b) thereof.

17.     Defendant Argust Merchant Services LLC ("Angus") was a co-venturer with Net subsidiaries in material aspects of Net's business at the time of the Merger and is a New York limited liability company located at 40 Exchange Place, Suite 1607, New York, New York. Pursuant to an assignment of the Divestiture Agreement, whose approval was solicited through the defective Proxy and thereafter became the assignee of 100% of Net ownership interest in TOT Group, Inc. a wholly owned subsidiary of Net wherein Net's business operations resided. The Divestiture was procured through a shareholder vote which violated Section 14(a) of the Securities Exchange Act of 1934 and is thus void under Section 29(b) thereof.

**IV.**

**SUBSTANTIVE ALLEGATIONS**

A.      **Background Of MTI**

18.     MTI was a small startup with no saleable electric vehicles, no ability to mass produce vehicles, and no revenue.

19.     MTI's business began in 2011 when Defendant Michery acquired the assets of bankrupt electric vehicle company Coda Automotive.

20.     As of December 31, 2020, Mullen employed 49 full-time employees and 14 consultants based primarily in Mullen's headquarters and engineering office, respectively, in Brea and Anaheim, California. By the time of the Merger, Mullen employed only 44 full-time employees

B.      **Background Of Net**

21.     Net was a payment processing platform for small businesses in the U.S. and selected company markets. Even during the height of the pandemic, which Net described had been materially adversely impacted starting with the COVID lockdown in March 2020, Net

6

business was so profitable that even for the three months ended June 30, 2020 its gross margins were 16% of revenues. Beginning in the last quarter of 2020, as the Covid lockdown subsided, Net's payment volume began increasing.

### C.     The 2020 Announcement Of The Merger Between Net And MTI

22.     On August 4, 2020, Net and MTI announced the execution of the Merger Agreement. The Merger Agreement was amended on December 29, 2020. On March 30, 2021, the Merger Agreement was again amended to extend the outside date for the effective time of the Merger to April 30, 2021. The Merger Agreement amended a fourth time on July 20, 2021 ("2nd Am. Restated Merger Agreement").

### D.     The Materially False And Misleading Statements About MTI In The Proxy

23.     In SEC filings, it was admitted that Net and its directors and MTI and its directors were participants in the solicitation of proxies from Net stockholders with respect to the merger and all other transactions described in the Proxy Statement.

24.     On July 22, 2021, Amendment No. 1 to Form S-4 was filed with the SEC which informed shareholders of a special meeting on August 26, 2021 to, *inter alia*, approve the Merger. On July 26, 2021, SEC issued a Notice of Effectiveness to Net's S-4 which contained the Proxy soliciting the vote for approval of the Merger.

25.     The Proxy Statement formed part of an S-4 Regulation Statement and was therefore required to adhere to the dictates and standards and requirements of Regulation S-K.

26.     The Proxy Statement expressly stated: "Information in the Proxy statement/prospectus regarding Net Element, Inc. has been provided by Net Element and information contained in this proxy statement/prospectus regarding Mullen has been provided by Mullen." Proxy at 8.

27.     The 2d Am. Restated Merger Agreement was put to a vote of Net shareholder and votes were solicited via a Schedule 14(a) Proxy Statement dated July 22, 2021 (the "Proxy").

28.     In the Proxy, it was falsely represented:

a)     That "Mullen's initial entry into the EV and SUV ("ESUV") market will be designed, engineered and manufactured in the United States." (Proxy at 145).

b)     "Mullen is currently in the process of acquiring an advanced manufacturing engineering center in Tunica, Mississippi. . ." (Proxy at 146).

c)     "The 127,400 square feet AMEC facility also has the assets and capacity to support assembly of vehicles up to 5,000 per year." *Id.*

d)     "Mullen is currently negotiating to secure a lease of an 820,000 square foot manufacturing facility in Memphis. . ." *Id.*

e)     "Mullen's success depends in part upon Mullen's ability to protect its core technology and intellectual property." (Proxy at 148).

29.     These statements were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) the timelines disclosed for production and sales of Mullen's sports car and SUV lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; (ii) Mullen had already defaulted on its agreement with Qiantu, and Qiantu had already terminated that agreement; (iii) Mullen lacked advanced or valuable battery technology, and had performed only very limited testing on its battery which did not support its claims; and (iv) Mullen's "joint venture" with NextMetals Ltd. did not exist.

8

E.   **Michery "Solicited" In Favor Of The Merger In A Series
     Of Public Statements Calculated To Influence The Vote**

30.     Shortly after the Merger agreement was signed, Michery issued a series of

materially false and misleading press releases about MTI to influence the vote on the Merger and

thereby constitute "solicitation" as defined under SEC rules.

31.     Under 17 C.F.R. 240.14a-1(l), a "solicitation" includes ". . . . other

communications to security holders under circumstances reasonably calculated to result in the

procurement, withholding or revocation of a proxy." Michery's statements were "reasonably

calculated" to influence the shareholders' votes. *In the Matter of John Joslyn*, Exchange Act

Release No. 50588, 83 S.E.C. Docket 3127, 2004 WL 238744 at *11 (Oct. 26, 2004).

1.     **June 15, 2020**

32.     On June 15, 2020, Net Element issued a press release titled "Net Element Enters

into a Letter of Intent to Merge with Electric Vehicle Company Mullen Technologies." The

information in the press release concerning Mullen was supplied to Net Element by MTI and

Michery.

33.     The June 15 press release described Mullen as follows, "[f]ounded in 2014,

Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through

ICI (Independent Commercial Importers)." Immediately below this paragraph was the following

picture:



The press release continued, "Mullen is launching this car in conjunction with a cooperation agreement with Qiantu Motor, a wholly-owned subsidiary of CH-Auto, a leading automotive design and manufacturing company in China. Due to the COVID-19 pandemic, Mullen pushed the targeted date for ICI release of the Dragonfly K50 for 2nd quarter of 2021."

34.     The June 15 press release quoted Defendant Michery as stating that the merger "comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021 . . . and the development of a new EV model, the MX-05 Sport Utility Vehicle, that we expect the start of production next year."

35.     The June 15 press release further quoted Defendant Michery stating, "becoming public at this time should allow us to accelerate the development of our unique battery technology, which is non-flammable, puncture proof, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources."

36.     The June 15 press release stated that, "[a]ccording to Mullen, Mullen expects to be entering the market with a Sport Utility Vehicle (SUV) using an established and proven product, manufacturing and advanced technologies, and to be produced in the United States." The press release continued, "According to Mullen, the first SUV Mullen expects to introduce

will be the MX-05, a mid-size luxury SUV that will be featured as a battery electric vehicle. . . The MX-05 is expected to fit the Mid-Size SUV segment. Mullen projects for pre-launch to have several hundred units produced in 2021 and kickoff into full production in 2022." This text was accompanied by the following image:



37.     Shortly following Net Element's June 15, 2020 press release, on June 16, 2020, Mullen Technologies issued a press release titled, "NETE: Net Element Announces LOI for Reverse Merger With Mullen Technologies, Maker of EVs." The press release featured Mullen's logo at the top, and listed a location of Brea, California (the location of Mullen's headquarters) in its date line. The press release stated, "For Information, Please Contact: Mullen Technologies, Inc.," and went on to provide Mullen's contact information. Mullen maintains the press release on its website through the present.

38.     The June 16 press release stated that "Mullen Technologies plans to sell Qiantu Motors' electric vehicles. Qiantu is a Chinese manufacturer that is a subsidiary of CH Auto based in Beijing. It already sells vehicles in China. Mullen has an agreement to sell those vehicles in the US and plans to assemble them here. It needs capital to pay for an assembly plant.

Mullen is expected to deliver its first vehicle, the Dragonfly K50, in Q2 2021." This text was followed by a picture captioned "Figure 1. Dragonfly K50 at the 2019 New York Auto Show":



The press release continued, "Mullen Technologies . . . currently sources cars from its Chinese OEM partner Qiantu Motor."

39.     Regarding Mullen's battery technology and partnerships, the press release stated:

> Mullen Technologies is rumored to be highly valued based both on its business prospects and it intellectual property. It has valuable lithium battery patents to create batteries rivaling Tesla's technology. It has a joint venture with Ukrainian company NextMetals Ltd. to create a solid-state battery under a new division called "Mullen Next."

40.     The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) the timelines disclosed for production and sales of Mullen's sports car and SUV lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; (ii) Mullen had already defaulted on its agreement with Qiantu, and Qiantu had already terminated that agreement; (iii) Mullen lacked advanced or valuable battery technology, and had performed only very limited testing on its

battery which did not support its claims; and (iv) Mullen's "joint venture" with NextMetals Ltd. did not exist.

41.     On August 5, 2020, Net and MTI announced the Merger Agreement signing.

**2**.     **August 10, 2020 Announcement Regarding Battery Test Results**

42.     On August 10, 2020, Mullen Technologies issued a press release titled, "Mullen Technologies Announces Further Test Results of Its Licensed Solid-State Polymer Battery Technology."

43.     The August 10 press release stated that Mullen was announcing "results from the independent testing of its licensed solid-state polymer battery technology undertaken by EV Grid, Inc. ('EV Grid'), an independent lab based in San Dimas, California." The press release stated, "The results provided support that the Company's licensed battery technology may be capable of enabling an electric vehicle to travel 640 miles at a cruising speed of 55 mph on a flat surface, and 550 miles at a cruising speed of 75 mph, which could allow for significantly longer driving distances on a single charge than commercially available lithium batteries offer today." This was accompanied by the following image:



44.     The August 10 press release stated "Previous testing results from tests conducted by BOAO indicated that the Cell suffered no degradation when operating from -40 degrees Celsius to 60 degrees Celsius. In addition, under extreme driving conditions the battery pack suffered less than 2% degradation over 10,000 charge/discharge cycles. Charging from empty to full takes approximately 35 minutes utilizing a fast charger."

45.     The August 10 press release quoted Defendant Michery as stating, "We believe our licensed solid-state battery technology should provide us with an advantage over many other

companies in the EV space as it could have the ability to provide vehicle owners with significantly increased range from a single charge."

46.     The above statements were materially false and/or misleading, and/or failed to disclose materially adverse facts because the results of EV Grid's very limited testing did not support Defendants' statements.

### 3.     September 24, 2020 Announcement Regarding Monrovia, California Manufacturing Facility

47.     On September 24, 2020, Mullen Technologies issued a press release titled "Mullen Technologies to Begin Construction of Electric Vehicle Pilot Facility."

48.     The September 24 press release stated "Mullen Technologies' high voltage battery R&D center in Monrovia, California, begins its transformation into a state-of-the-art pilot facility for its line of fully electric SUVs on the first of October. The construction is slated for completion by April 2021 with the first MX-05 SUVs, each assembled in America by American workers, expected to be delivered to customers by the second quarter of 2022."

49.     The September 24 press release further stated, "Pre-orders continue as well for the Company's Dragonfly K50, a limited production super sports car being imported under Independent Commercial Importers ('ICIs')."

50.     The September 24 press release stated "The pilot facility will be used to assemble up to 1,000 MX-05 fully electric vehicles per year and subsequently for all other upcoming models such as the MX-07 and MX-03. The operation consists of general assembly, battery assembly, R&D facility and warehouse."

51.     The September 24, press release quoted Defendant Michery as stating:

> We are excited to begin the build-out of our pilot facility and pre-sales of our MX-05 SUV in October. We plan on completing the build-out by April 2021 and to begin assembly of certification

prototypes by July 2021. These vehicles will be used for homologation which is expected to take 16 months and be completed by May of 2022, at which time we expect to begin delivering the first vehicles to the public.

52.     The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Mullen lacked the ability to convert the Monrovia, California site into a state of the art SUV manufacturing facility by April 2021; (ii) the timelines disclosed for production of Mullen's SUV lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; and (iii) Qiantu had already terminated its agreement with Mullen, so Mullen could not produce the K50 sports car.

### 4.     October 1, 2020 Announcement Regarding Production And Sale Schedule For Mullen SUVs

53.     On October 1, 2020, Mullen Technologies issued a press release titled, "Mullen Technologies is Now Accepting Pre-Orders for Its MX-05 Pure Electric All-Wheel Drive SUV."

54.     The October 1 press release stated "Mullen announced earlier this month that development of its pre-production facility in Monrovia, California, will begin today, October 1. This facility will be fully operational in mid-2021 and is scheduled to begin the pre-production process of the MX-05 in the third quarter 2021."

55.     The October 1 press release further stated, "First deliveries to the public should be in the second quarter 2022."

56.     The October 1 press release stated "The five passenger MX-05 pure electric all-wheel drive SUV, featuring a range of 325 miles with a 0 to 60 mph time of 3.2 seconds, is designed to outperform vehicles in its class. In order to reserve the MX-05, simply make the $100 deposit and review the terms and conditions at https://mullenusa.com/mullen-mx-05/."

57.     The above statements were materially false and/or misleading, and/or failed to

disclose material adverse facts because (i) Mullen lacked the ability to convert the Monrovia,

California site into a SUV manufacturing facility that would be fully operational by mid-2021;

(ii) the timelines disclosed for production of Mullen's SUV lacked a reasonable basis given the

significant regulatory, testing, and manufacturing requirements that Mullen had not met; and (iii)

Mullen had not conducted testing sufficient to verify its statements

regarding the SUV's purported technical capabilities.

### 5.     December 30, 2020 Announcement Regarding Purchase Order For 1,500 Mullen SUVs

58.     On December 30, 2020, Mullen Technologies issued a press release titled,

"Mullen Technologies Receives Letter of Intent for Purchase Order of 1,500 MX-05 Electric

Vehicles."

59.     The December 30 press release stated, "the Company has executed a non-binding

Letter of Intent with Unlimited Electrical Contractors Corp (UEC) to enter definitive agreements

for the purchase of up to 10,000 MX-05 electric vehicles."

60.     The December 30 press release further stated:

> UEC's mission is to be the first electrical contractor with an all-
> electric service fleet and intends on executing a definitive
> agreement with the Company for the purchase of 1,500 MX-05
> electric vehicles for its Florida operations. To follow by up to an
> additional 8,500 by 2025 for its U.S. West Coast expansion. The
> initial purchase order is estimated at $75 million. The vehicles are
> based on a modified variant of the MX-05, an electric crossover
> SUV based on a skateboard EV platform and a unibody frame that
> comes in a single or dual electric motor configuration.

61.     The December 30 press release quoted Defendant Michery as stating "We're very

excited to work with UEC and are very fortunate that they see the value in Mullen and the MX-

17

05 for their business. UEC's order is the first of many commercial fleet relationships we are currently working on."

62.     The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts because UEC was a small company with approximately 11 vehicles, which never had the ability or need to purchase 1,500, let alone 10,000, Mullen SUVs.

### 6.     March 8, 2021 Announcement Regarding Battery Partnership With Nextech Batteries

63.     On March 8, 2021, Mullen Technologies issued a press release titled, "Mullen Technologies and Nextech Batteries Will Deliver the Most Advanced Lithium Sulphur Battery Technology Available Today."

64.     The March 8 press release stated, "Mullen plans to produce more than 100,000 vehicles over 5 years using NexTech lithium sulfur (Li-S) pouch format batteries, which are 60% lighter than today's EV's, improving vehicle efficiency and reducing overall energy consumption."

65.     The press release quoted Defendant Michery as stating:

> With NexTech's advanced lithium sulfur battery technology, cost savings compared to conventional batteries and readily available materials, Mullen has competitive advantage over all EV manufacturers. Not to mention a 2.5X higher specific energy compared to today's lithium-ion batteries, they are capable of operating without losses in extremely high and low temperatures with minimal conditioning which improves the overall efficiency . . .
>
> Mullen will launch our first-generation vehicle in late 2023 with NexTech's current cells and will work in parallel to phase in their next generation solid state battery technology into our pack designs. This will keep Mullen as a leader in this space for generations of vehicles.

66.     The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Nextech remained in preliminary testing stages for its batteries, and so Defendants' statements regarding the batteries' technical specifications and production timeline lacked a reasonable basis; and (ii) the timelines disclosed for production of Mullen's vehicles lacked a reasonable basis given the early stage of NexTech's technology and the significant regulatory, testing, and manufacturing requirements that Mullen had not met.

### 7.     March 11, 2021 Announcement Regarding Tunica, Mississippi Manufacturing Facility

67.     On March 11, 2021, Mullen Technologies issued a press release titled, "Mullen Technologies Announces Purchase of Advanced Engineering and Manufacturing Center in Tunica, MS."

68.     The March 11 press release stated that Mullen had entered an agreement to purchase what it referred to as "a EV manufacturing facility in Tunica, Mississippi." The press release continued, "This five-year-old, turn-key facility affords Mullen the opportunity to innovate its manufacturing processes, while having the availability to assemble vehicles now and optimize product design with simultaneous engineering efforts."

69.     The March 11 press release further stated that the facility "will employ approximately 50+ people in the first year, with the objective of expanding to 200+ employees in three years."

70.     The March 11 press release quoted Defendant Michery as stating "Our goal is to sustain 100% of our manufacturing processes in the US and by US workers. With the establishment of AMEC in Tunica, we are among the very few EV companies that have a manufacturing presence in the US." Defendants called the Tunica, Mississippi facility the "Advanced Manufacturing Engineering Center," or AMEC.

19

71.     The March 11 press release further quoted Defendant Michery as stating "Tunica will allow us to perfect the engineering and manufacturing processes involved in building our EVs, while affording us the ability to assemble vehicles now. This facility is ideal for Mullen's upcoming initiatives and will be pivotal in allowing us to get to the production of our vehicles in less than typical time."

72.     The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) the Tunica, Mississippi facility was not "advanced," "turn-key," or immediately operational, but rather needed substantial work and additional equipment before electric vehicle manufacturing could begin; (ii) Mullen lacked the ability to retain over 50 new hires to staff the facility in its first year; and (iii) Mullen had no realistic path to conducting 100% of its manufacturing in the United States, and its plans always substantially depended on importing and re-branding vehicles primarily manufactured in China.

**8.      March 18, 2021 Announcement Regarding Memphis, Tennessee Manufacturing Facility**

73.     On March 18, 2021, Mullen Technologies issued a press release titled, "Mullen Set to Rock 'n' Roll in Memphis." The press release stated "Memphis, Tennessee, to Become US Manufacturing Hub for Mullen's EVs."

74.     The March 18 press release announced Mullen's "intent to execute a long-term lease on an 820,000-square-foot facility in Memphis, Tennessee," stating that "Mullen plans to create up to 800 jobs and deliver 100,000 vehicles over a five-year period, commencing in Q4 of 2023."

75.     The March 18 press release continued:

> The 2P6 SUV crossover (formerly MX-05) will be the first in Mullen's line of fully electric vehicles that will be manufactured at this facility. Mullen is currently working on midstage design

20

efforts for the 2P6 in Southern California. Once completed, Mullen will begin building prototype vehicles in its newly acquired facility in Tunica, Mississippi, for initial engineering development and certification. Simultaneously, Mullen will spend the next 33 months creating the necessary infrastructure and installing the required machinery and equipment for the Memphis facility to support large-scale EV production.

76.   The March 18 press release quoted Defendant Michery as stating, "Our pilot facility in Monrovia, California, has now been moved to Tunica, Mississippi. Tunica is more cost-effective and efficient, with close proximity to Memphis. Ultimately, this will produce significant savings in time and money."

77.   The March 18 press release further stated:

On March 11, 2021, Mullen announced the purchase of a facility located 50 miles away from Memphis, Tennessee, in Tunica, Mississippi, which will provide advanced engineering and manufacturing capabilities. Both facilities will support Mullen's manufacturing requirements for the next 10-plus years.

78.   The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Defendants either had not determined whether the Memphis, Tennessee facility was in adequate condition to serve their stated purposes and their stated timeline, or already knew that it was not; (ii) the timelines disclosed for production of Mullen's vehicles lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; (iii) Mullen had no reasonable basis for statements regarding how "advanced," "cost-effective," or "efficient" the Tunica, Mississippi facility was because Mullen was nowhere close to commencing production of electric vehicles at that facility, and that facility needed substantial work and additional equipment before electric vehicle manufacturing could begin.

### 9.   August 3, 2021 Announcement Regarding Purchase Order For 1,200 Mullen Cargo Vans

79.   On August 3, 2021, Mullen Technologies issued a press release titled, "Heights Dispensary Enters Into $60 Million Agreement to Purchase 1,200 Mullen ONE Electric Delivery Vans."

80.   The August 3 press release stated that "the Company has entered into a Letter of Agreement with Height Dispensary, LTD., to purchase 1,200 Mullen One electric vans and has selected Mullen as its exclusive provider for electric vehicles. The total vehicle purchase order is valued at over $60 million."

81.   The August 3 press release further stated, "The initial Mullen ONE vehicle order will consist of 200 EV vans for Heights Dispensary's Houston and Dallas operations, to be delivered on or before the end of third quarter 2023. Additionally, Heights will purchase 1,000 Mullen ONEs by second quarter 2025. The Mullen ONE EV Cargo Van vehicles are a modified variant of the Mullen FIVE, an electric crossover SUV."

82.   The August 3 press release quoted Defendant Michery as stating "The Heights order is the second, among many other companies we are currently working on, to select Mullen as their EV provider. The FIVE skateboard platform allows us to configure and offer the vehicle for many different types of commercial trade uses."

83.   The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Heights Dispensary primarily used USPS to deliver its products, and never had the ability or need to purchase 200, let alone 1,200, cargo vans from Mullen; and (ii) Mullen was not capable of manufacturing electric cargo vans as a variant of its planned SUV platform.

**F.     The Proxy's Materially Misleading Statements Regarding
        Net And The Merger And Divestiture**

84.     The Proxy contained Net Board's recommendation to shareholder to vote "for" on all thirteen proposals on the ballot.

85.     There was no specific reasons or rationale provided in the Proxy for the recommendation to vote "for" the Divestiture.

86.     The Proxy did not include any reasons for their recommendation to vote for the Merger or Divestiture.

87.     The Proxy failed to disclose that prior to the closing of the Merger, Defendant Michery threatened to its then largest lender Drawbridge Investment, LLC with scuttling the merger if Drawbridge did not agree to waive its antidilution protections in its July 23, 2020 settlement agreement with Mullen. Drawbridge's waiver resulted in an increase in Michery's post-merger equity ownership. *See DRI Lease Buy Back Servicing LLC v. Mullen Automotive*, New York Supreme Court, March 2, 2023, NYSCEF Doc. No. 1, page 6 of 26.

88.     The waiver of the antidilution provisions and increase in Michery's eventual ownership of Mullen was not disclosed in the Proxy.

89.     The Proxy included a sub-section entitled "Risk of Shareholder dilution Post-Merger" which misrepresented the potential dilution by failing to disclose TOA's 3% of shares as compensation for putting MTI together with NET.

90.     The Proxy overstated the "RiskFactors of Existing Net Element Business" Proxy at 194 ("Financial Condition") and Proxy at 195 ("Business And Operations") by failing to disclose the quarterly sequential improvement in Net's payments volume starting in December 31, 2020.

91.     The final fairness opinion was issued on May 9, 2021 and thus could not, and did not take account of the "significant recovery in its end-to-end payments volumes as some merchants begin resuming their normal operations" as first disclosed to Net shareholders on May 17, 2021 in a press release.

92.     The Proxy, in the section entitled "Business of Net Element" (Proxy at 165 et seq.), subsection "Recent Developments (*Id*. at 167) referred to Net's March 31, 2021 improving volumes but misleadingly omitted the sequential material quarterly increase through June 30.

93.     In disclosing the "material factors" negative and positive considered by Net's board in approving the merger, the Proxy failed to address the role of the Divestiture as a positive or negative. Proxy at 57-58.

94.     Regulation M-A which governs disclosures of Mergers requires at Item 1005 (Instruction to Paragraph (b) an (c)) the disclosure of material contacts with the acquiror "and other potential transaction parties." Here the Proxy failed to disclose any information about the Divestiture other than a single paragraph in a Proxy supplement issued on the eve of the vote. There were no details provided in the Proxy about how the Divestiture proposal originated, or how its was negotiated, or how the consideration was determined, or how RBL Capital Group LLC, Net's major lender came into the picture, how Net pre-arranged an "assignment" of Net's Divestiture to Angus. The Divestiture was not addressed in the Fairness Opinion. The Divestiture Agreement was signed on July 20, 2021.

95.     There was no explanation in the Proxy for the Board's rationale for recommending a vote for Divestiture.

96.     The Proxy also failed to include the assignment to Angus and the Divestiture to RBL under "related party transactions" which was required by SEC regulation in light of the

Combined Marketing Agreements between Defendant Argus and a wholly owned subsidiary of Net, "TOT Payments LLC." As of 2021, Argus and a subsidiary of Net were joint owners of a "portfolio of cash flow assets" which were material to Net's business. *See* Net 10-K, December 31, 2020 at page 38.

97.     On August 19, 2021, Mullen made "Supplemental Disclosures To Defective Proxy Statement/Prospectus" and filed same with the SEC.

98.     In that Supplement, the Proxy supplemented the following statement "None of Mr. Martinez, Dr. Ahmad or TOA Trading received or are due any compensation from Net Element" from the Proxy and "replaced it in its entirety" with "None of Mr. Martinez, Dr. Ahmad or TOA Trading received or are due any compensation from Net Element in connection with the merger or the referral of Mullen Technologies, Inc. as a potential merger partner." Supplement at page 2.

99.     The Proxy concealed the existence of a "finder's fee" agreement between Mullen and TOA Trading LLC and Munshibari LLC amounting to 3% of Mullen stock. Instead in the "Background of the Merger" section Proxy at 89-91.

100.     TOA and Munshibari LLC have a written agreement to pay them 3% of the "total purchase consideration" in Mullen stock.

101.     By failing to disclose the finders fees agreement, the Proxy concealed from shareholders the 3% dilution of their equity in the merged companies and thereby misrepresented the actual amounts of past merger equity per share and dilution.

102.     The Proxy also misrepresented the fact that it was Defendant Firer who initiated contact with TOA in May 2020. According to the complaint in *TOA Trading LLC et al. v. Mullen Automotive, Inc.*, U.S.D.C. SDFL 22-cv-21089, ECF No. 1 at page 7 "In May 2020 NETE's

CEO, Oleg Firer asked Mr. Martinez if he knew of any companies interested in doing a transaction with NETE."

103.    In the Supplement, the Proxy disclosed for the first time that all of Net Elements payment processing business would be conveyed by RBL (to whom Net Element was conveying the business) to Argus Merchant Services LLC ("Argus"). The Supplement represented:

> In the ordinary course of business, Net Element processes credit and debit card payment transactions for merchants introduced by various independent sales organizations ("ISOs") and has purchased books of receivables from such ISOs, including from Argus Merchant Services LLC ("Argus"). This is the extent of Net Element's relationship with Argus . . . Net Element has not and will not receive any renumeration for RBL's decision to assign the assets it will receive pursuant to the Divestiture to Angus. Supplement at 3.

104.    The supplemental proxy falsely represented the relationship between Net and Argus by representing that the "extent of Net Elements relationship with Argus" was that Net purchased receivables from Argus. In fact, Net and Argus had a "five year partnership" "expected to generate $19 million in gross margins" over five years from 2019 to 2024. Argus' managing partner Eugene gold noted "the unprecedented support and commitment we have received from Net . . ."[1]

### G.    Regulation S-K Requirements Applicable To Proxy Materials

105.    Regulation S-K (17 C.F.R. Part 229) Prescribes qualitative disclosures in proxy and registration statements (Item 10).

106.    Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."[2]  Accordingly, Item 503 requires

---

[1] *See* https://www.cryptocurrencywire.com/asset-acquisition-grant-new-potential-to-payments-technology-developer-net-element-inc-nasdaq-nete/January 17, 2019.

[2]        *See* Offering Reform, S.E.C. Release No. 8501,2004  WL 2610458, at *86 (Nov. 3, 2004).

that offering documents "provide under the caption 'Risk Factors' a discussion of the most

significant factors that make the offering speculative or risky."[3]  The discussion of risk factors

must be specific to the particular company and its operations and should explain how the risk

affects the company and/or the securities being offered.  Generic or boilerplate discussions do

not tell the investors how the risks may affect their investment.[4]

107.    Item 503, thus, provides that a registration statement must disclose all known

material risks that are "specific to the particular company and its operations."[5]  Item 503(c)

warns issuers:  "[d]o not present risks that could apply to any issuer or any offering."[6]

108.    Item 303 of Regulation S-K [17 C.F.R.  §229.303], *Management's Discussion and*

*Analysis of Financial Condition and Results of Operations* ("MD&A") during the Class Period.

In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of

Regulation S-K, which states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment,
> event or uncertainty is both presently known to management and
> reasonably likely to have material effects on the registrant's
> financial condition or results of operation.

109.    Defendants breached their fiduciary duties by failing to heed numerous, obvious

red flags of inaccurate Proxy solicitations.

110.    As a result of the Defendants' breaches, detailed herein, the Company's

shareholders were induced to vote in favor of a disastrous and unfair Merger and Divestiture

which harmed NE.

---

[3]        17 CFR § 229.503(c).

[4]        Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv.
Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

[5]        *Id.*

[6]        17 CFR § 229.503(c).

**V.**

**DEMAND FUTILITY**

111.     Demand would be futile in this action because the Board could not exercise independent and disinterested business judgment in responding to a demand.  The Board currently consists of seven directors, four of whom have been directors of MULN since before the Merger and thus face a substantial probability of personal liability.

112.     Mullen's current Board consists of seven members, David Michery, Ignacio Novoa, Mary Winter, Mark Betor, John K. Anderson, William Miltner and Kent Puckett.

113.     Puckett, Betor, Winter and Michery are pre-merger members, directors and/or executive officers of pre-mergers Mullen who were involved in the preparation and filing of the Proxy Statement used to solicit the vote of Plaintiff and other class members and who consulted with each other and Net Element before issuing the public statements identified herein (as described in the proxy-prospectus filed with the SEC under the sub-heading "Additional Agreements." As a result of their actions and omissions in connection with the misleading solicitation/proxy, these Defendants face a substantial likelihood of non-exculpated personal liability and could not fairly and independently consider a demand upon the board to sue the Defendants herein.

114.     Director Miltner is not independent of the director defendants of Mullen because he has been Mullen's attorney since 2020, and for the fiscal year ended September 30, 2023, Miltner received $1,058,105 from Mullen for services. His compensation is therefore subject to Michery's approval.

115.    Defendant Winter is currently a consultant to Mullen, who, in addition to her director compensation, received $60,000 in fiscal year 2023 and continues, through the present to receive $5,000 per month. Her compensation is subject to Michery's approval.

**H.    Mullen's Import Plans Revealed**

116.    On September 21, 2021, Mullen Technologies issued a press release titled "Mullen and CRRC Group's Subsidiary, Tenglong Automotive, Sign Definitive Agreement for Class 1 and Class 2 EV Cargo Vans for Assembly and Sales in US and Mexico Market With Deliveries Commencing March 2022." Defendants' statements in the press release were materially false and misleading, but also partially revealed the truth to investors, causing a substantial decline in Net Element's publicly traded stock price.

117.    The announcement revealed that, despite Mullen's bold claims only two months earlier that it would soon manufacture large numbers of electric cargo vans for Heights Dispensary based on Mullen's SUV platform, Mullen in fact planned to simply import electric cargo vans from China and rebrand them. According to the September 21 press release:

> [Mullen] has entered into a definitive agreement with Tenglong Automotive, a subsidiary of CRRC Group, for manufacturing, distribution and retail sales of Class 1 and Class 2 EV Cargo Vans in the U.S. and Mexico. The agreement provides Mullen with an effective solution for the fast-developing EV cargo van market and its existing EV fleet van orders. Mullen will homologate and assemble the vans at its Advanced Manufacturing and Engineering Facility (AMEC), located in Tunica, Mississippi. Vehicles will be assembled in the United States and branded: "Assembled in the United States."

118.    Following Defendants' admission that Mullen now planned to simply import Chinese electric cargo vans instead of manufacturing them, Net Element's share price fell $0.66 as compared to the prior day closing price, or 7.4%, to close at $8.25 per share on September 21, 2022, on heavy trading volume.

**FIRST CAUSE OF ACTION**

**AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 14(A)**
**OF THE SECURITIES EXCHANGE ACT OF 1934 AND**
**AGAINST DEFENDANTS MICHERY AND FIRER UNDER SECTION 20**

119.    Plaintiff hereby repeats and realleges each and every allegation above as if fully set forth herein.

120.    Shareholders voting in the 2021 vote for the Merger and Divestures were provided with a Proxy Statement to solicit their votes in favor of all proposals including Nos. 1 and 7.

121.    The Proxy Defendants caused Net to issue the Proxy Statement.

122.    The inaccuracies and omissions in the Proxy Statement concerned matters of material importance to the Company and to were material to shareholders with respect to solicitations embodied in each Proxy Statement.  The Proxy Statements were an essential link in the Merger and Divestiture which harmed Net.

123.    The Proxy Defendants' failure to include these material facts in the Proxy Statement rendered the Proxy Statement materially inaccurate and incomplete, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

124.    In connection with the improper acts alleged under this Count, the Proxy Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

## SECOND CAUSE OF ACTION

### AGAINST THE DEFENDANTS MICHERY AND FIRER, FOR CONTRIBUTION FOR VIOLATIONS OF SECTION 10(b) AND 21D OF THE EXCHANGE ACT

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    Michery and Firer are named as Defendants in related securities class actions. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their acts.

127.    Mullen is named as a Defendant in related securities class actions that allege and assert claims arising under section 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.  If Mullen is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of Michery and Firer as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

128.    As officers, directors, and otherwise, Defendants had the power to ability to, and did, control over influence, either directly or indirectly, Net and Mullen's general affairs, including the content of its public statements, and has the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5.

129.     Defendants Michery and Firer are liable under section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

130.     Defendants Michery and Firer have damaged the Company and are liable to the Company for contribution.

131.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

### THIRD CAUSE OF ACTION

**BREACH OF FIDUCIARY DUTY
(AGAINST THE NET DIRECTORS AND AGAINST
THE MULLEN DIRECTORS FOR AIDING AND ABETTINT THEREOF)**

132.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.     The Defendants owed the Company a fiduciary duty and obligation of good faith, candor, fair dealing, loyalty, due care, reasonable inquiry and supervision.  The Defendants breached these fiduciary duties.

134.     The Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135.     As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, Net has sustained significant damages.

## FOURTH CAUSE OF ACTION

### AGAINST MULLEN TO RESCIND THE DIVESTITURE
### CONTRACT UNDER SECTION 29(B) OF THE EXCHANGE ACT

136.     Plaintiffs incorporate by reference and re-allege each and every preceding

allegation set forth above, as though fully set forth herein.

137.     According to the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356

U.S. 375, 386-87 (1970) (footnotes omitted):

> This language establishes that the guilty party is precluded from
> enforcing the contract against an unwilling innocent party.

138.     Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as

follows:

> Every contract made in violation of any provision of this chapter or
> of any rule or regulation thereunder and every contract . . .
> heretofore on hereafter made the performance of which involves
> the violation of, or the continuance of any relationship or practice
> in violation of any provision of this chapter or any rules or
> regulation thereunder, shall be void . . . as regards the rights of any
> person who in violation of any such provision, rule or regulation
> shall have made or engaged in the performances of contract.

139.     The Executive Officer Defendants violated provisions of The Exchange Act while

performing their duties under various employment agreements and other contracts they entered

into with RBL and/or Argus.

140.     As a result of the foregoing Net is entitled to recession of those agreements and

contracts and/or return of all monies and benefits previously paid thereunder.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

(a)     Determining that this action is a proper derivative action maintainable under law

and demand is excused;

(b)     Awarding, against all Defendants and in favor of Mullen, the damages sustained by the Company as a result of Defendants' breach of fiduciary and contractual duties;

(c)     An Order invalidating the Merger and Divestiture vote Proxy Statement or for damages;

(d)     Awarding rescission or a rescissory measure of damages;

(e)     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(f)     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 14, 2024                    SQUITIERI & FEARON, LLP


By: */s/Lee Squitieri*_____
        Lee Squitieri
305 Broadway
7th Floor
New York, New York 10007
(212) 421-6492
lee@sfclasslaw.com

MOORE LAW, PLLC
Fletcher Moore (*pro hac vice* forthcoming)
30 Wall Street, 8th Floor
New York, New York 10005
(212) 709-8245
fletcher@fmoorelaw.com

Attorneys for Plaintiff

## <u>VERIFICATION</u>

I, Marius Martis, hereby declare as follows:

I am the plaintiff named in the foregoing Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Mullen Automotive, Inc., and know the content thereof.  That Complaint is true to my knowledge, except as to those matters stated on information and belief or which I do not have personal knowledge, and I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of Mullen Automotive, Inc., stock at all relevant times.  I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 11, 2024

<u>Marius Martis (Mar 11, 2024 10:35 PDT)</u>

Marius Martis